**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**WAYNE LESLIE STOKES,**

                              **Plaintiff,**

        **vs.**                                          **7:10-CV-1129**
                                                         **(MAD)**

**MICHAEL J. ASTRUE, Commissioner of**
**Social Security,**

                              **Defendants.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

CONBOY, McKAY, BACHMAN &
KENDALL, LLP                            Scott B. Goldie, Esq.
2 Judson Street
Canton, New York 13617
_Attorneys for Plaintiff_

Social Security Administration          Benil Abraham, Esq.
Office of Regional General Counsel      Special Assistant U.S. Attorney
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
_Attorneys for Defendant_

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

        Plaintiff Wayne Leslie Stokes, brings the above-captioned action pursuant to 42 U.S.C. §

405(g), seeking a review of the Commissioner of Social Security's decision to deny his

application for disability insurance benefits ("DIB").

**PROCEDURAL BACKGROUND**

On April 11, 2008, plaintiff filed an application for DIB benefits.  (Administrative Transcript at p. 72).[1]  Plaintiff was 38 years old at the time of the application with prior work experience as driver for a medical transportation service and as a small systems repair technician in the United States Marine Corp.  (T. 100).  Plaintiff was also a Sergeant with the United States Army and worked as a gunner with heavy weapons in Iraq.  Plaintiff claimed that he was disabled, beginning on February 9, 2006 due to migraine/cluster headaches, neck pain, fibromyalgia, high blood pressure, post traumatic stress disorder and low back pain.  (T. 81).  On September 10, 2008, plaintiff's application was denied and plaintiff requested a hearing by an ALJ which was held on January 9, 2009.  (T. 21, 45).  Plaintiff appeared with an attorney. (T. 23).  On February 10, 2009, the ALJ issued a decision denying plaintiff's claim for benefits.  (T. 20).  The Appeals Council denied plaintiff's request for review on July 30, 2010 making the ALJ's decision the final determination of the Commissioner. (T. 1-4).  This action followed.

## FACTS

In March 2005, plaintiff began treating at the V.A. Medical Center in Syracuse, New York upon referral from his platoon officer for anger control issues.  (T. 253).  Plaintiff was still on active duty but sent home on disability after being stationed in Iraq.  At the time, plaintiff resided with his mother and his three children.  Plaintiff expressed problems controlling his temper with his children but denied experiencing any depressive symptoms or difficulty sleeping.  Plaintiff was examined by Dr. David Reznik who found plaintiff to be anxious with limited impulse control.  Plaintiff was diagnosed with a "significant back injury" and adjustment disorder with

---

[1]  "(T. )" refers to pages of the administrative transcript, Dkt. No. 8.

anxiety.  Dr. Reznik prescribed Klonopin and referred plaintiff to Dr. Donald Blaskiewicz in the neurology clinic.[2]

On March 21, 2005, Dr. Blaskiewicz examined plaintiff for complaints of numbness in his right leg.  The doctor concluded that plaintiff's pain related to blunt trauma to the sciatic nerve from being bounced around on rough roads.  (T. 252).  Upon review of MRI films, Dr. Blaskiewicz concluded that surgery was not an option and discharged plaintiff from the clinic.

In April 2005, plaintiff began counseling sessions with Salvatore Puleo, a social worker.  (T. 248).  Plaintiff claimed that he experienced side effects from his medication including sleep issues.  Mr. Puleo described plaintiff as tolerant and less easily frustrated.

In May 2005, plaintiff was examined by Dr. Hilda Vega, a psychiatrist.  (T. 247).  Dr. Vega noted that plaintiff was taking Prozac[3] and Klonopin with some side effects but overall, plaintiff was "calm".  Dr. Vega diagnosed plaintiff with anxiety disorder.  (T. 245).  On May 10, 2005, Mr. Puleo noted that plaintiff was "stable, doing well and engaged" and that he "improved with counseling".  (T. 246).

In June 2005, plaintiff appeared for counseling in a "bizarre and robot-like state".  Plaintiff described several family stressors including issues with his brother, the possible deportation of his fiancee and financial/legal conflicts with his ex-wife.  Plaintiff also experienced significant sexual side effects from his medication.  Mr. Puleo noted that plaintiff was diagnosed with ADHD and anxiety.  In June 2005, plaintiff was also examined by Dr. David Carter, neurologist, for complaints of neck and low back pain.  Plaintiff stated that rest and physical therapy had not abated his pain.  Upon examination, Dr. Carter noted that plaintiff had a full

---

[2] Klonopin is administered orally and used in the treatment of panic disorders.  *Dorland's Illustrated Medical Dictionary* 379, 1003 (31st ed. 2007).

[3] Prozac is used in the treatment of depression and obsessive-compulsive disorder.  *Id*. at 730, 1562.

range of motion in his neck with mild discomfort and full strength in his extremities. (T. 244).

Dr. Carter diagnosed plaintiff with degenerative disc disease in his cervical and lumbar spine but

opined that surgery was not an option.  Dr. Carter prescribed physical therapy and referred

plaintiff to the pain clinic.

In August 2005, Dr. Vega re-examined plaintiff and noted that plaintiff was tired, "could

not think straight", frustrated and anxious.  Dr. Vega prescribed Trazadone to help plaintiff sleep

and concluded that plaintiff was anxious due to his musculoskeletal pain.[4]  Dr. Vega also referred

plaintiff to the pain clinic. (T. 242).

In September 2005, Dr. Debra O'Leary prepared a Primary Care Note after examining

plaintiff.  Dr. O'Leary noted that plaintiff was a "new patient" in the clinic. (T. 239).   Dr.

O'Leary noted that plaintiff was still "active military, but he is out for medical and mental health

reasons".  Plaintiff complained of neck pain, shoulder pain, headaches, sleep issues and numbness

in his feet.  Plaintiff advised that he was taking several medications for his conditions including

Imitrix for his headaches.  Dr. O'Leary diagnosed plaintiff with cervical and low back pain,

paresthesis, mental health issues and cluster headaches.  She ordered tests for plaintiff's blood

pressure and modified his medications.  Dr. O'Leary would not provide plaintiff with narcotics

since his MRI films were benign.  She prescribed Mobic and Gabapentin and advised plaintiff to

discontinue Imitrix because the headaches were "cluster headaches" and the best treatment was

oxygen.[5]  (T. 238).  In September 2005, plaintiff also saw Mr. Puleo who noted that plaintiff was

---

[4]  Trazadone is an antidepressant used to treat major depressive episodes with or without prominent anxiety. *Dorland's* at 1983.

[5] Mobic is a nonsteroidal anti-inflammatory drug used in the treatment of osteoarthritis; administered orally. *Id*. at 1189.  Gabapentin which is an anticonvulsant used as adjunctive therapy in the treatment of partial seizures; administered orally.  *Id*. at 764, 1287

anxious and experiencing nightmares and sexual side effects.  Plaintiff also indicated that he was seeking a military discharge due to his medical and family problems.

In October 2005, plaintiff had a follow up visit with Dr. O'Leary complaining of an increase in his symptoms and stated that the Prozac and Trazadone did not agree with him.  Dr. O'Leary referred plaintiff for a back consult and EMG.  Upon physical examination, Dr. O'Leary noted that plaintiff had a full range of motion in his lumbar spine, he could walk from heel to toe and had a normal gait.  Dr. O'Leary diagnosed plaintiff with neck and low back pain, ADD and anxiety.   Nerve conduction studies were normal. (T. 235).  In October 2005, Mr. Puleo noted that plaintiff had a flat affect and problems focusing and communicating.  Plaintiff stated that he was using a TENS unit for his back pain that relieved some pain. (T. 234).

In November 2005, Dr. Vega noted that plaintiff felt that he was not doing very well.  He was hearing noises, frustrated, forgetful and had disruptive sleep from sweats and nightmares. Upon examination, Dr. Vega noted that plaintiff was very anxious, overwhelmed and "stressed out".  Dr. Vega was concerned because plaintiff was "very very anxious" and therefore, wanted to see plaintiff again in two weeks.  Dr. Vega diagnosed plaintiff with Post Traumatic Stress Disorder ("PTSD") (New Onset) and major depressive disorder.  She prescribed Effexor and Seroquel and discontinued Trazadone.[6] (T. 233).

In December 2005, Mr. Puleo noted that plaintiff was happy because he was relieved from active duty but that plaintiff was unhappy with his status with the National Guard.  In addition, plaintiff was experiencing significant family problems and smoking problems.  Plaintiff spent his

---

[6] Effexor is used as an antidepressant and antianxiety agent.  *Dorland's* at 602, 2074.   Seroquel is an antipsychotic medication used in the treatment of schizophrenia. *Id.* at 1590, 1723.

time playing video games until his children returned from school.   In December 2005, plaintiff told Dr. Vega that he was "stressed" and "hated life".  Plaintiff was under financial strain that was exacerbated by the holidays.  In addition, plaintiff's fiancee was facing deportation to Canada. Dr. Vega diagnosed plaintiff with significant anxiety, post traumatic stress disorder and major depressive disorder.  Dr. Vega prescribed Venlafaxine and Quetiapine and opined that plaintiff was not a suicide risk.[7]  (T. 230).

In January 2006, plaintiff appeared for counseling in a more relaxed state.  However, plaintiff claimed that he suffered sexual abuse at age six and recently "harmed" his girlfriend when she attempted to touch him. (T. 228).  Plaintiff was experiencing flashbacks and had difficulties sleeping.  In January 2006, plaintiff was treated at the pain clinic for low back pain. The doctors prescribed Neurontin and Meloxicam.[8]

In February 2006, Mr. Puleo reported plaintiff to be irritable and restless.  However, in March 2006, Mr. Puleo found plaintiff "jovial" and excited about the possibility of moving to a new home.  Plaintiff expressed an interest in obtaining a tattoo to signify his "rebirth" after being discharged from the military.  Plaintiff complained of problems in his sex life. (T. 222).  In March 2006, Dr. Vega noted that plaintiff's PTSD and Major Depressive Disorder were in remission and in an effort to improve plaintiff's sexual drive, she decreased his medications. (T. 220).  In March 2006, plaintiff also treated with Dr. O'Leary for migraine headaches.  Dr. O'Leary continued to opine that the headaches were cluster headaches and prescribed Zomig and suggested that

---

[7] Venlafaxine hydrochloride, a serotonin-norepinephrine reuptake inhibitor, is used as an antidepressant and antianxiety agent.  *Dorland's* at 602, 2074.  Quetiapine fumarate, a dibenzothiazepine derivative that is an antagonist to multiple neurotransmitter receptors in the brain and is used as an antipsychotic in the treatment of schizophrenia and other psychotic disorders.  *Id.*  at 1591, 1723

[8]  Neurontin is an anticonvulsant used as adjunctive therapy in the treatment of partial seizures.  *Id.* at 764, 1287.  Meloxicam is an anti-inflammatory.  *Id.* at 1189.

plaintiff monitor his blood pressure.[9] (T. 219).  On March 30, 2006, during his counseling session, plaintiff advised that he hurt his back attempting to be amorous with his girlfriend and continued to complain of sexual side effects that hurt his relationship.  Plaintiff indicated that his interests included playing computer games,  raising fish, and attending social functions in his spare time.  Plaintiff had a new tattoo and was pursuing employment.

In April 2006, plaintiff advised Mr. Puleo that he had married but he was anxious and frustrated with his job search and lack of sleep.  In May 2006, plaintiff again complained of his various stressors including employment issues, financial issues and family strains including difficulties with immigration.

In July 2006, plaintiff advised Mr. Puleo that his wife was still in Canada and could not move until he had a job.  Plaintiff continued to experience vivid nightmares.  In August 2006, plaintiff was treated by Dr. Vega.  He reported various stressors including issues with border patrol, financial strains and flashbacks.  Dr. Vega opined that plaintiff's PTSD and MDD were still in remission and prescribed Wellbutrin, Effexor and Ambien and advised plaintiff to discontinue the Quetiapine.[10]  (T. 208).  In July 2006, plaintiff also underwent an MRI scan which revealed a small disc protrusion at L5-S1 touching the S1 nerve root. (T. 225).

In October 2006, plaintiff continued to complain of legal and financial problems and noted that his wife and mother were constantly fighting in the home.  In February 2007, plaintiff had a follow up visit with Dr. O'Leary.  At that time, plaintiff was working as an ambulance driver but

---

[9] Zomig is used to treat acute migraine attacks.  www.http://pdr.net (last visited February 27, 2012).

[10] Wellbutrin is used as an antidepressant and as an aid in smoking cessation to reduce the symptoms of nicotine withdrawal. *Dorland's* at 265, 2107.  Ambien is a preparation of zolpidem tartrate, a non-benzodiazepine sedative-hypnotic used in the short-term treatment of insomnia. *Id*. at 58, 2120.

was worried about his medications and drowsiness.  Dr. O'Leary noted that plaintiff's blood pressure was elevated and prescribed Atenolol and Gabapentin.[11]  (t. 205).  At the end of February 2007, plaintiff told Mr. Puleo that he lost his job because he fell asleep while on duty. (T. 204).

In March 2007, plaintiff participated in a sleep study and was diagnosed with mild sleep apnea which was moderately severe in the supine position.  The doctors suggested that plaintiff utilize a CPAP (Continuous Positive Airway Pressure) machine at home.

In April 2007, plaintiff appeared for his counseling session walking with a cane.  He was "spaced out" and unable to drive.  Plaintiff complained of nightmares, family strains, depression, inactivity and concerns with weight gain.   In May 2007, plaintiff told Mr. Puleo that he was busy with projects at home but that he continued to experience financial and legal strains.  Plaintiff was pursuing EMT training and a volunteer position with the local Fire Department.  Plaintiff asked for, but was denied, a drug holiday. (T. 193).  In July 2007, plaintiff had three epidural steroid blocks for his back pain.

In August 2007, Mr. Puleo noted that plaintiff was negative and angered by the fact that he was denied a handicap parking sticker.  He continued to have family issues and was distraught over a lost bird.  Plaintiff missed his "comrades" and was anxious and tense.  In August 2007, Dr. Vega noted that plaintiff was not well, agitated and angry.  Plaintiff's mother and wife continued to argue at home, he was depressed and under financial strain.  Plaintiff also continued to walk with a cane.  Dr. Vega noted that plaintiff was angry, intolerant and volatile and prescribed Depakote, Ambien and Sertraline.[12]  Dr. Vega also noted that plaintiff's mother was a military

---

[11]  Atenolol is used in the treatment of hypertension.  *Dorland's* at 173.

[12]  Depakote is used in the treatment of manic episodes associated with bipolar disorder.  *Id*. at 497, 565.  Sertraline hydrochloride is a drug used to treat depressive, obsessive compulsive, and panic disorders.  *Id*. at 1724.

veteran and also a patient at the VA center and that plaintiff was only telling "one side of the story".

In September 2007, plaintiff was screened and tested positive for PTSD. (T. 182). The screen involved a series of questions. In response to four questions, plaintiff answered "YES", which resulted in a positive screen. In September 2007, plaintiff appeared for counseling and was described as "depressed". Plaintiff continued to use a cane. Plaintiff stated that he was becoming an EMT but that he could not do anything at home due to his pain. Plaintiff continued to experience stressors with his finances, upkeep of his property and family. (T. 181). In September 2007, Dr. O'Leary completed a form, at plaintiff's request, for his position as a volunteer fire fighter. She opined that he would be restricted in bending and lifting due to his back pain.

In January 2008, plaintiff told Dr. Vega that he was awarded "100% disability by the VA". Plaintiff continued to have problems with his mother but was volunteering as an EMT. Dr. Vega asked plaintiff how his back pain impacted his job and plaintiff responded, "I only do what I can do". Plaintiff was still anxious and his affect was constricted. Dr. Vega opined that plaintiff's PTSD was in remission. Dr. Vega suggested "cross therapy" with plaintiff's mother, who was also her patient. In January 2008, Mr. Puleo reported that plaintiff was less stressed, able to support his family and was taking classes at the local community college.

In March 2008, plaintiff appeared for counseling and was very angry. Plaintiff felt that the VA breached his confidentiality and provided his mother with information that he relayed during counseling and therapy. As a result, his mother left the home causing additional financial strain on the family. (T. 170).

In April 2008, plaintiff appeared at the back clinic with a cane. He was diagnosed with chronic back pain and prescribed methadone, hydrocodone and physical therapy. In April 2008,

9

the records also indicate that plaintiff responded well to the CPAP machine and a full face mask was ordered. (T. 168).  In May 2008, plaintiff advised Mr. Puleo that he overdosed on Methadone.  Plaintiff completed EMT training, was working as a volunteer fire fighter and planning to attend vocational rehabilitation.  He still had family issues and stressors relating to immigration and his wife. (T. 167).

In August 2008, plaintiff was evaluated by Richard W. Williams, Ph.D., at the request of the agency.  Dr. Williams conducted a psychological evaluation.  (T. 265).  Plaintiff complained of flashbacks and nightmares relating to his time in Iraq.  Plaintiff described anger issues and claimed that he resolved those issues by shooting an old junk car. (T. 265).  Plaintiff's wife lived and worked in Canada and would visit on the weekends.  Plaintiff admitted that this upset him.  During the week, plaintiff cared for his children and did the chores with his oldest daughter and played video games.  Plaintiff appeared for the examination with a cane.  He was alert and oriented, his judgment was impulsive but his thoughts were clear and his speech was normal.  Dr. Williams found plaintiff's history of anxiety, anger, flashbacks and nightmares to be consistent with the diagnosis of PTSD and noted that plaintiff's course of treatment was appropriate.

On August 15, 2008, H. Ferrin, a non-examining reviewing consultant, prepared a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique.  Ferrin opined that plaintiff did not meet any listing and that he suffered from mild restrictions in his activities of daily living and maintaining social functioning and moderate difficulties maintaining concentration, persistence and pace. (T. 278).  Ferrin opined that overall there was some psychiatric limitations however, "claimant is viewed as able to understand and remember instructions, sustain attention and concentration for tasks, relate adequately to others, and adapt to changes". (T. 284).

On August 21, 2008, Dr. Justine Magurno performed an orthopedic examination of plaintiff at the request of the agency. (T. 286).  Plaintiff complained of constant pain in his back that he described as a 2 or 3 out of 10, with radiating pain to his legs.  Plaintiff also complained of cluster headaches, with variable frequency and three or four migraine headaches since 2004.  Plaintiff stated that he cooked, cleaned, did laundry, shopped and cared for his children.  Dr. Magurno diagnosed plaintiff with low back pain with radicular symptoms, muscle spasms in the legs, neck pain and cluster and migraine headaches.  She opined that while his prognosis for his back was poor, it was "good" for headaches with treatment.  Dr. Magurno opined that plaintiff had marked limitations in walking, standing, sitting, climbing, lifting, carrying, pushing and pulling and moderate limitations in reaching and bending. (T. 289).

In September 2008, J. Terret, a non-examining reviewing consultant, prepared a Physical Residual Functional Capacity Assessment.  The consultant opined that plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently and stand and/or walk and sit for 6 hours in an 8 hour workday. (T. 303).

On December 22, 2008, the Department of Veterans Affairs issued a Rating Decision with the determination that plaintiff was entitled to 100% unemployability benefits effective August 21, 2007 due to plaintiff's degenerative disc disease of the lumbar spine with radiculopathy.  (T. 309-313).  The Department also determined that plaintiff's sleep apnea was not related to his military service. (T. 309).  In reaching the decision, the Department considered plaintiff's treatment records from VAMC from April 16, 2007 through August 12, 2007, a VA examination dated September 20, 2007, a review of plaintiff's claim folder and plaintiff's statements in support of his claim. (T. 314).   The Department provided "Reasons for Decision" noting, *inter alia*:

Evidence from recent VA examination indicated that due to the severity of the degenerative disc disease in your back, you are unable to bend, push, pull, lift, kneel, squat, stoop, sit or stand for any length of time without severe pain.  You were only able to flex to 20 degrees and you could not extend the back at all.  You experience severe leg and hip pain.  Review of your claims folder revealed that you are service connected for PTSD, headaches and degenerative disc disease of cervical spine.  Review of VA out patient treatment reports that you are receiving treatment for these conditions and mild sleep apnea, hypertension and ear infections.  Last VA examination on October 5, 2006 indicated that due to PTSD you would be moderately impaired in ability to work.  Evidence in record reveals that you are unable to work due to service connected back and PTSD disabilities.

## DISCUSSION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

12

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw*, 221 F.3d at 131.  Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  The Court may also set aside the Commissioner's decision when it is based upon legal error.  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

The ALJ found at step one that plaintiff had not engaged in substantial gainful activity since February 9, 2006.  (T. 15).  At step two, the ALJ concluded that plaintiff suffered from lumbar spine disorder which qualified as a "severe impairment" within the meaning of the Social Security Regulations (the "Regulations").  (T. 15).  At the third step of the analysis, the ALJ determined that plaintiff's impairment did not meet or equal the severity of any impairment listed in Appendix 1 of the Regulations.  (T. 17).  The ALJ found that plaintiff had the residual functional capacity ("RFC") to, "perform the full range of sedentary work.  He can occasionally lift and/or carry about 10 pounds, less than 10 pounds frequently, stand and/or walk at least 2 hours and sit about 6 hours in an 8-hour work day, has an unlimited ability to push and/or pull using all of the extremities and no has [sic] postural, manipulative, visual, communicative or environmental limitations".  (T. 17).  At step four, the ALJ concluded that plaintiff did not have the residual functional capacity to perform any of his past relevant work.  (T. 19).  At step five, relying on the medical-vocational guidelines ("the grids") set forth in the Regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ found that plaintiff had the RFC to perform jobs existing in significant numbers in the national economy.  (T. 19).  Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act.  (T. 20).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) the Commissioner erred by failing to find that plaintiff's post traumatic stress disorder, anxiety, headaches and sleep apnea were "severe impairments"; (2) the ALJ failed to apply the "treating physician's rule"; (3) the ALJ afforded improper evidentiary weight to the opinions of the state agency medical consultant; and (4) the ALJ did not properly assess plaintiff's credibility. (Dkt. No. 10).

## I.      Severity of Plaintiff's Mental Impairments at Step Two

Plaintiff claims that the ALJ committed reversible error when she failed to find that his post traumatic stress disorder and anxiety were severe impairments. Plaintiff argues that the ALJ improperly substituted her own opinion for competent medical proof.

A "severe" impairment is one that significantly limits an individual's physical or mental ability to do basic work activities. *Meadors v. Astrue*, 370 F. App'x 179, 182 (2d Cir. 2010) (citing 20 C.F.R. §§ 404.1520, 416.920). The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include,

> (1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b); see also Social Security Ruling 85-28, 1985 WL 56856, at *3-4, Titles II and XVI: Medical Impairments That Are Not Severe (S.S.A.1985).

Plaintiff has the burden at step two in the sequential evaluation process to demonstrate the severity of her impairment. *See* 20 C.F.R. § 404.1520. The severity analysis at step two may do no more than screen out *de minimis* claims. *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir.1995).

14

The Regulations require the ALJ to utilize a "special technique" at each step of the administrative review process when a claimant suffers from a mental impairment. *Rosado v. Barnhart*, 290 F.Supp.2d 431, 437 (S.D.N.Y. 2003) (citations omitted); 20 C.F.R. §§ 404.1520a(a); 416.920a(a).  First, the ALJ must evaluate the claimant's symptoms, as well as other signs and laboratory findings, and determine whether the claimant has a "medically determinable mental impairment."  20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1); *see also Dudelson v. Barnhart*, 2005 WL 2249771, at *12 (S.D.N.Y. 2005).  If a medically determinable impairment exists, the ALJ must "rate the degree of functional limitation resulting from the impairment [ ]."  20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).   This process requires the ALJ to examine all relevant clinical and laboratory findings, as well as the effects of the symptoms on the claimant, the impact of medication and its side effects, and other evidence relevant to the impairment and its treatment. 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1).  The ALJ must rate the degree of the claimant's functional limitation in four specific areas, referred to as "Paragraph B" criteria: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).  The ALJ rates the first three areas on a five-point scale of "none," "mild," "moderate," "marked," and "extreme," and the fourth area on a four-point scale of "none," "one or two," "three," and "four or more." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).  If the first three areas are rated as "none" or "mild," and the fourth as "none," the ALJ will conclude that the mental impairment is not severe "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities."  20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

Here, the ALJ's analysis of plaintiff's anxiety and PTSD is confined to the following paragraph:

On August 15, 2008, H. Ferrin, one of the Administration's medical record review psychologists, advised that the claimant had an anxiety-related disorder (PTSD) that was severe, but did not meet or equal listing level severity. . . .I conclude that the claimant's post-traumatic stress disorder does not cause more than minimal limitation in his ability to perform basic mental work activities. It is not severe. He sees a therapist only once every two months. He has been successful at EMT training and in school, and cares for 3 children by himself, all of which necessarily requires a significant amount of mental and physical functioning. His mental symptoms present no more than mild limitation in daily living activity, mild limitation in social functioning and mild limitation in maintaining of concentration, persistence and pace and there have not been episodes of deterioration of extended duration. (T. 16-17).

Having thoroughly reviewed the medical record, the Court finds that the ALJ committed three significant reversible errors in her assessment of plaintiff's mental impairments at Step Two of the sequential analysis.

### A.   Substantial Evidence

In the decision, the ALJ specifically rejected the Mental RFC Assessment prepared by H. Ferrin.  The ALJ failed to assign any weight to any other medical opinions or treatment records. While the ALJ summarized Dr. Williams' report of his consultative examination, the ALJ did not analyze or even mention plaintiff's treatment for mental impairments which included extensive psychiatric treatment and therapy.  Indeed, the ALJ never mentioned the names of plaintiff's treating physicians or therapists.  At Step Two, the ALJ concentrated her analysis on plaintiff's musculoskeletal complaints and essentially ignored plaintiff's longstanding diagnosis relating to PTSD and anxiety.

In the paragraphs addressing the severity of plaintiff's mental impairments, the ALJ did not cite to any records, reports or opinions from any treating physician or any consultative examiner as support for her conclusion that plaintiff's PTSD and anxiety are not severe impairments.  Based upon the insufficient record, the Court is unable to determine what evidence

the ALJ relied upon in reaching the assessment. Thus, the Court cannot conclude that the ALJ's determination regarding the severity of plaintiff's anxiety and PTSD is supported by substantial evidence.

### B.    Duty to Develop Record

While the record contains V.A. progress notes and treatment records, the record lacks a Medical Source Statement ("MSS") or Mental RFC Assessment from any treating or examining physician.  The ALJ noted this lack of evidence in the decision but did not make any attempt to contact any treating or examining source. (T. 16).

An ALJ has an obligation to develop the administrative record, including, in certain circumstances, recontacting a source of a claimant's medical evidence, *sua sponte*, to obtain additional information.  *Lukose v. Astrue*, 2011 WL 5191784, at *3 (W.D.N.Y. 2011) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)). The ALJ will obtain additional evidence if he/she is unable to make a determination of disability based on the current record. 20 C.F.R. § 404.1527(c)(3). The Regulations provide:

> If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence under the provisions of §§ 404.1512 and 404.1519 through 404.1519h. We will request additional existing records, recontact your treating sources or any other examining sources, ask you to undergo a consultative examination at our expense, or ask you or others for more information. We will consider any additional evidence we receive together with the evidence we already have.

20 C.F.R. § 404.1527(c)(3).

This duty exists regardless of whether Plaintiff has counsel or is continuing *pro se.  Perez v. Chater*, 77 F.3d 41, 47 (2d Cir.1996). "The duty to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating

physician' provisions in the regulations." *Dickson v. Astrue*, 2008 WL 4287389, at *13 (N.D.N.Y. 2008). The caselaw in this Circuit is clear as courts have consistently held that if the record does not contain any Medical Source Statement or RFC Assessment from plaintiff's treating physician, the ALJ has a duty to contact plaintiff's treating physician in an attempt to obtain an assessment. *See Pitcher v. Barnhart*, 2009 WL 890671, at *14 (N.D.N.Y. 2009) (an MSS or RFC from the treating physician was important because the ALJ granted the other physician's MSS "moderate weight," and the only other individual to assess Plaintiff's RFC was a disability analyst); *see also Hopper v. Comm 'r of Soc. Sec.*, 2008 WL 724288, at *11 (N.D.N.Y. 2008); *see also Dickson*, 2008 WL 4287389, at *13. This duty also includes advising the plaintiff of the importance of such evidence. *Batista v. Barnhart*, 326 F.Supp.2d 345, 353 (E.D.N.Y. 2004) ("[a]t a minimum, if the ALJ is inclined to deny benefits, he should advise a claimant that her case is unpersuasive and suggest that she supplement the record or call her treating physician as a witness") (citation omitted). The Regulations provide that, "[t]he Commissioner should request an MSS from the claimant's treating physician if such a statement has not been provided. *Outley v. Astrue*, 2010 WL 3703065, at *4 (N.D.N.Y. 2010) (citing 20 C.F.R. § 416.912(d) (explaining that the Commissioner will "make every reasonable effort to help you get medical reports from your own medical sources, a medical report should include an MSS"). In decisions involving the ALJ's duty to obtain an MSS, courts frequently cite to Judge Spatt's explanation in *Peed v. Sullivan*:

> What is valuable about the perspective of the treating physician—what distinguishes him from the examining physician and from the ALJ—is his opportunity to develop an informed opinion as to the physical status of a patient. To obtain from a treating physician nothing more than charts and laboratory test results is to undermine the distinctive quality of the treating physician that makes his evidence so much more reliable than that of an examining physician who sees the claimant once and who performs the same tests and studies as the treating physician.

*Peed v. Sullivan*, 778 F.Supp. 1241, 1246 (E.D.N.Y.1991).

"Although the regulation provides that the lack of such a [MSS] statement will not render a report incomplete, it nevertheless promises that the Commissioner will request one." *Johnson v. Astrue*, 2011 WL 4348302, at *10 (E.D.N.Y.2011) (citations omitted). The ALJ must request such a statement regardless of whether the record contains a complete medical history. *Id.* (citing § 404.1513(b)(6)). The failure to contact the physicians constitutes a breach of the ALJ's duty to develop the record and provides a basis for remand. *Lawton v. Astrue*, 2009 WL 2867905, at * 16 (N.D.N.Y. 2009). When the ALJ's decision is made, "without reference to the reports of the treating mental health professionals", the ALJ's failure to develop the record concerning plaintiff's mental conditions, coupled with the lack of evidence supporting the ALJ's findings, warrants this Court's reversal and remand for additional proceedings. *See Rivera v. Barnhart*, 379 F.Supp.2d 599, 608 (S.D.N.Y. 2005).

In this case, plaintiff's treatment for anxiety and PTSD is well documented. The administrative record contains voluminous treatment notes from plaintiff's physicians and therapists at the V.A. Medical Center including his psychiatrist, Dr. Hilda Vega. From 2005 thorough 2008, plaintiff's therapists and psychiatrists consistently diagnosed plaintiff with anxiety disorder, major depressive disorder and PTSD. Dr. Vega provided a continuous course of therapy and prescribed a number of potent medications that resulted in serious side effects. *See Fuller v. Astrue*, 2010 WL 5072112, at*7 (W.D.N.Y. 2010) (the ALJ overlooked the fact that the plaintiff tried several psychiatric medications with limited relief). Moreover, plaintiff attended numerous counseling sessions with a social worker who noted that plaintiff was hyper vigilant, angry, tense, anxious and stressed. Given the nature of plaintiff's impairments, the opinions of his treating physicians, and specifically, his psychiatrists, are important and the ALJ "should have

inquired further with [the] treating psychiatrists and therapists."   *See Kilkenny v. Astrue,* 2009

WL 1321692, at *2 (S.D.N.Y. 2009).

During the administrative hearing, the ALJ also failed to advise plaintiff of the importance

of obtaining this information.  At the beginning of the administrative hearing, plaintiff's attorney

stated that it was, "the polic[y] of the Veteran's Administration [ ] not [to] complete an RFC for

my client.  I think that's just a general policy for all veterans". (T. 24).  Plaintiff's counsel did not

provide support for that assertion during the hearing and the issue was not addressed in the

parties' briefs.  In the decision, the ALJ did not address this contention or otherwise detail any

efforts to contact or obtain an RFC from any physician associated with the Veteran's

Administration.   There is no evidence in the record that plaintiff's physicians would not provide

the necessary assessments.  *See Oakes v. Astrue*, 2009 WL 1109759, at *13 (N.D.N.Y. 2009) (a

physician at the VA Clinic refused one request by the plaintiff to fill out SSA paperwork.

However, the Court held that a single statement, by only one of the many physicians that the

plaintiff saw at the VA clinic, does not amounts to the ALJ having "know[n] from past experience

that the source either cannot or will not provide the necessary findings." 20 C.F.R. §§

404.1512(e)(2), 416.912(e)(2)).  Given the importance of the treating physician's opinions, the

Court remands this matter so that the ALJ may make reasonable efforts to obtain an assessment of

plaintiff's mental functional limitations.  Plaintiff's physicians at the VA Medical Center can be

considered treating sources and as such, the VA Medical Center should have been re-contacted by

the ALJ for an MSS or RFC assessment. *See Oakes*, 2009 WL 1109759, at *13.

**B.    Substituted Judgment**

The ALJ also improperly rejected the opinions presented by the reviewing psychologist.

While the ALJ was not required to afford controlling weight to H. Ferrin's opinion, the ALJ is not

permitted to substitute her own expertise or view for a competent medical opinion. *Rosa*, 168 F.3d at 79; *see also Mahoney v. Apfel*, 48 F.Supp.2d 237, 245 (E.D.N.Y. 1999) (the ALJ's own medical expert opined that the plaintiff met a listed impairment). Ferrin's opinion, in conjunction with plaintiff's treatment notes, provides substantial evidence to show that plaintiff's PTSD and anxiety were severe impairments. *See Fuller*, 2010 WL 5072112, at *7.

In this instance, due to the insufficient record, "[t]he ALJ could either have requested a more specific explanation from [the treating physician] or referred [the plaintiff] to another consultative exam, but [s]he most emphatically was not permitted to substitute [her] assessment of the severity of [the plaintiff's] psychiatric problems." *See Ceballos v. Bowen*, 649 F.Supp. 693, 701 -702 (S.D.N.Y. 1986); *see also Fuller v. Astrue*, 2010 WL 5072112, at *7-8 (W.D.N.Y. 2010) (the ALJ improperly substituted her opinion for that of the consultative examiner who diagnosed the plaintiff with depression). Thus, since the Court has ordered remand for the issues discussed about, the ALJ should also revisit Ferrin's opinions and apply the Regulations to determine and explain what weight, if any, should be assigned to the opinions.

## II.     Severity of Headaches and Sleep Apnea

Plaintiff also claims that the ALJ failed to recognize that his headaches and sleep apnea were severe impairments despite his regular treatments for these conditions. (Dkt. No. 10, p. 13).

### A.     Headaches

The ALJ noted that while plaintiff claimed that he suffered from migraine and cluster headaches, the record did not contain a medical source statement showing that this condition more than minimally adversely affected the claimant's ability to engage in work activity. Thus,

the ALJ concluded that the impairment was not severe in the context of Social Security disability adjudication.  (T. 16).  Upon a review of the record and the applicable regulations, the Court finds that the ALJ's determination is not supported by substantial evidence.  The ALJ thoroughly summarized and discussed plaintiff's examination with Dr. Magurno and noted that she diagnosed plaintiff with cluster and migraine headaches. (T. 16).  However, as with Dr. Williams' conclusions, the ALJ failed to assign any weight to Dr. Magurno's opinions.

Moreover, as discussed above, the ALJ committed reversible error when she failed to contact plaintiff's treating physicians to obtain their opinions with respect to his functional limitations.  Thus, the ALJ erred when she concluded that plaintiff's headaches were not severe based upon the lack of a medical source statement.  Accordingly, on remand, the ALJ shall revisit the issue of plaintiff's allegations regarding both cluster and migraine headaches at Step Two.

### B.    Sleep Apnea

In Step Two of the sequential analysis, the ALJ did not mention or analyze plaintiff's sleep apnea.  Despite this omission, the record does not support plaintiff's claim that this impairment impacted his ability to perform basis work functions.  The "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, itself, sufficient to deem a condition severe.  *McConnell v. Astrue*, 2008 WL 833968, at *2 (N.D.N.Y. 2008) (citing *Coleman v. Shalala*, 895 F.Supp. 50, 53 (S.D.N.Y. 1995)).  A condition that improves and is repairable may not be considered a disability for purposes of disability benefits.  *See Pennay v. Astrue*, 2008 WL 4069114, at *4 (N.D.N.Y. 2008).

During the hearing, the ALJ asked plaintiff to describe his physical problems.  In response, plaintiff testified that he had PTSD, migraines and neck pain.  Plaintiff did not mention sleep apnea.  Plaintiff testified that he experienced drowsiness, however, he also admitted that

drowsiness was a side effect of his medications and was dependent upon how much medication he took and the combination of medications. (T. 40). *Wavercak v. Astrue*, 420 F. App'x 91, 93 (2d Cir. 2011) (the ALJ correctly determined that the plaintiff's sleep apnea was not a severe impairment based upon the plaintiff's testimony that his fatigue and day-time drowsiness were caused more by the pain in his neck than from any sleep disorder). In addition, the medical records indicate that plaintiff was compliant with the doctor's instructions with regard to his CPAP machine and that he responded well to the treatment. *See Allen v. Comm'r of Social Sec.*, 2010 WL 5175027, at *5 (N.D.N.Y. 2010) (the record indicated that the plaintiff's CPAP machine provided significant relief, thus, her sleep apnea did not impair her abilities to perform work related activities). Consequently, the Court finds that substantial evidence supports the ALJ's determination in this regard.

**III.     The ALJ's Application of the Treating Physician Rule and Assessment of Medical Opinion Evidence**

**A.     Treating Physicians**

Plaintiff argues that the ALJ erred when she failed to afford controlling weight to the opinions of plaintiff's primary treating physicians at the V.A. The Court has already discussed the ALJ's errors with respect to plaintiff's treating physicians. Upon remand, the ALJ shall attempt to obtain functional evaluations from plaintiff's treating physicians and properly analyze the opinions of the treating physicians according to the Commissioner's Regulations.

**B.     Disability Examiner**

Plaintiff also argues that the ALJ improperly relied upon the opinion of the medical consultant in formulating plaintiff's RFC. While plaintiff does not specify which opinion he objects to, from a review of the record, it appears that plaintiff is referring to the opinions expressed by J. Terrett, in the Physical RFC Assessment. Plaintiff claims that the opinion is not

entitled to any weight.  (Dkt. No. 10, p. 21).  The Court disagrees with this broad statement.  "The opinions of non-examining sources may override [a] treating source's opinions provided they are supported by evidence of record." *See Diaz v. Shalala*, 59 F.3d 307, 313 n. 5 (2d Cir.1995); *see also Davies v. Astrue*, 2010 WL 2777063, at *6 (N.D.N.Y. 2010) (the ALJ may rely upon the opinions of a disability analyst if that opinion is also supported by substantial evidence in the record).   An ALJ may rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of Social Security disability." *Williams v. Astrue*, 2011 WL 831426, at * 11 (N.D.N.Y.2011) (citing 20 C.F.R. §§ 404.1512(b)(6), 404.1513©, 404.1527(f)(2), 416.912(b)(6), 416.913, and 416.927(f)(2)). Generally, a non-examining source's opinion, including the opinions of state agency medical consultants and medical experts, will be given less weight than an examining source's opinion. 20 C.F.R. § 416.927(d)(1).

Here, the ALJ referred to the Physical RFC Assessment:

> On September 4, 2008 one of the Administration's disability examiners prepared a Physical Residual Functional Capacity Assessment in which it was concluded that the claimant occasionally could lift and/or carry 20 pounds, 10 pounds frequently, stand and/or walk about 6 hours and sit about 6 hours in an 8-hour work day, had an unlimited ability to push and/or pull using all of the extremities, occasionally could stoop and had no manipulative, visual, communicative or environmental limitations. (T. 18).

While the ALJ summarized the assessment, the ALJ did not specifically assign weight to J. Terrett's assessment.  Terrett's assessment does not mirror the ALJ's RFC determination and therefore, it is unclear exactly how much weight the ALJ afforded to the Terrett's opinions.  "The sheer fact that the ALJ's RFC assessment corresponds with the disability analyst's assessment does not establish that the ALJ gave controlling weight to or otherwise impermissibly relied on the disability analyst's assessment." *Raite v. Astrue*, 2010 WL 4781562, at *5 (N.D.N.Y. 2010).

While the assessment of a disability analyst is not "medical evidence", reliance upon such an assessment does not warrant remand in every case.  *See Johnson v. Astrue*, 2011 WL 43483202, at *11, n. 15 (E.D.N.Y. 2011) (since the court remanded the case for failure to fully develop the record, on remand the ALJ should also properly consider the disability analyst as a non-medical source (rather than a medical source), in light of any additional information he receives from plaintiff's treating sources, and the other evidence already before him).

For the reasons set forth above, the record is incomplete.  Thus, the Court cannot conclude that the RFC is supported by substantial weight and cannot make a determination with regard to whether the ALJ's reliance upon Terrett's opinion was improper.  Upon remand, the ALJ shall consider Terrett's opinions, along with all other competent medical evidence and assign and explain the weight afforded to the opinions pursuant to the Regulations.

### C.       Disability Determination by Another Government Agency

While the determination of another governmental agency that a social security disability benefits claimant is disabled is not binding on the Secretary, it is entitled to some weight and should be considered." *Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2d Cir. 1975).  The VA's decision should be considered along with oral testimony and medical evidence as "another item to be placed on the evidentiary scale."  *Atwater v. Astrue*, 2012 WL 28265, at *5 (W.D.N.Y. 2012). Moreover, the VA's determination is material to the Commissioner if the VA granted a claimant disability benefits based on a claim identical to the one presented to the ALJ. *Zimmer v. Astrue*, 2009 WL 5066782, at *5 (E.D.N.Y. 2009).

The ALJ discussed a determination by the Veteran's Administration:

> The Veteran's Administration has found the claimant 100% disabled, because he cannot work.  I give little evidentiary weight to this assessment.  The consulting examiner found marked limitations and I agreed, except for limitations in sitting.  There is no reason he cannot

sit and has to do so when playing video games, using his computer and going to class (T. 18-19).

The ALJ essentially ignored the VA's determination of disability and failed to sufficiently explain her reasons for doing so.  The ALJ refers to a "consulting examiner" but there is no citation to what exam she is referring to or who the identity of the examiner.  Further, the Veteran's Administration specifically noted that the decision was based upon plaintiff's treatment at the V.A. Medical Center.  Since all of plaintiff's treatment was at the V.A. Medical Center, the ALJ was obligated to, at the very least, consider the Veteran's Administration determination as it was based upon the same medical record.  While the ALJ's errors with regard to this issue, standing alone, might be insufficient to set aside the Secretary's determination, the combination of this error in connection with the improper application of the regulations and failure to adequately develop the record, "persuades [the Court] that plaintiff did not have a fair and adequate hearing before the Secretary". *Hankerson v. Harris*, 636 F.2d 893, 896 -897 (2d Cir. 1980).  Upon remand, the ALJ should explain her reasons for rejecting this determination.

**IV.     Credibility**

"The ALJ has discretion to assess the credibility of a claimant's testimony regarding disabling pain and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979).  If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§

404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).  The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence.  *See* SSR 96–7p, 1996 WL 374186, at *2 (SSA 1996). One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record.  SSR 96–7p, 1996 WL 274186, at *5 (SSA 1996).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony. *Saxon*, 781 F.Supp.2d at 105 (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)).  An ALJ rejecting subjective testimony must do so explicitly and with specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence.  *Melchior v. Apfel*, 15 F.Supp.2d 215, 219 (N.D.N.Y.1998) (quoting *Brandon v. Bowen*, 666 F.Supp. 604, 608 (S.D.N.Y.1987) (citations omitted)).  The Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period. *Howe–Andrews v. Astrue*, 2007 WL 1839891, at *10 (E.D.N.Y.2007).

In this case, the ALJ noted:

> The claimant was evasive during his testimony at the hearing and there are inconsistencies in the record that raise concern and doubt about the claimant's credibility.  As an example, the claimant told at least 3 different stories about why he no longer is an EMT, ranging from a desire to spend more time with his wife to a problem getting a required driver's license to a problem failing asleep on the job and doing the work. (T. 18).

Plaintiff claims that the ALJ's credibility assessment is flawed due to the ALJ's misinterpretation of the record and facts regarding plaintiff's EMT training, success in school and parenting abilities.  The Commissioner disagrees and contends that the ALJ's statements are supported by the record.  "The fact that the [ALJ] may have missed, ignored, or misunderstood certain evidence that might support [the claimant's] claims ... does not mandate reversal as long as, on the whole record, substantial evidence supports his credibility determination." *See Shubargo v. Barnhart*, 161 F. App'x 748, 753 (10th Cir. 2005); *see also Ogundimo v. Astrue*, 2010 WL 3783464, at *11 (E.D.Cal. 2010) ("Because the ALJ's credibility determination did not rest solely on [the plaintiff's] testimony, the fact the ALJ misunderstood her testimony is harmless).  Here, the credibility determination was not based solely upon the alleged misinterpretation of medical or factual information.  Accordingly, remand is not warranted based upon this argument.

Citing to SSR 96-7p, the ALJ also found that plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the RFC assessment. (T. 18).   In this regard, plaintiff also claims that the ALJ ignored his testimony regarding the side effects of his medication.  Defendant claims that the ALJ's decision recites, in detail, plaintiff's subjective complaints including the side effects of his medication. (Dkt. No. 11, p. 20).

Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ incorrectly applied the standards, enumerated in 20 C.F.R. § 404.1529(c)(3)(i)-(iv), in assessing plaintiff's credibility.   The ALJ is entitled to make credibility determinations as long as he engaged in the proper analysis.  However, in this instance, the ALJ did not conduct the aforementioned analysis.  The ALJ summarized plaintiff's daily activities, subjective complaints

of pain, medications and side effects but concluded, without analysis, that plaintiff's statements were not credible "to the extent that they were inconsistent" with the RFC determination. *See Parker v. Comm'r of Social Sec*., 2011 WL 856380, at *8 (N.D.N.Y. 2011)  As discussed above, the ALJ failed to adequately develop the record and apply the Regulations with respect to the medical opinion evidence.  Thus, the RFC assessment is not supported by substantial evidence.  Accordingly, the ALJ's conclusion that plaintiff's subjective complaints would not preclude him from performing sedentary work is also not supported by substantial evidence.  *See id.*  Accordingly, on remand, the ALJ should analyze plaintiff's credibility pursuant to the Regulations.

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with the above; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated:  March 1, 2012
        Albany, New York

Mae A. D'Agostino
U.S. District Judge